May it please the Court, Kathleen Sullivan for Oracle. This case involves one of the most massive and brazen copyright infringements in history, a case that involved the theft of over 10 million Oracle files and over 7,000 copies of Oracle software by TomorrowNow, a company acquired by SAP. And that's undisputed. A liability was admitted for purposes of the trial, and criminal penalties ensued. What is at issue here is the damages amount. The jury awarded $1.3 billion. And I know, Your Honors, that's a very large number, but this was a very large theft. And that verdict by the jury was amply supported by objective evidence in the record. So the district court was erroneous or abused her discretion in reducing that amount. But as I understand it, the compensation here was not for the theft. It was for the value of this hypothetical license. Am I correct? Correct, Your Honor. And let me say so if we inject notions of theft, I mean, obviously, I mean, this was a tremendous copyright violation. Your Honor, I'm happy to take the word theft. No, that's okay. Let me substitute massive scale abuse. Sure. Well, it doesn't really matter. Right. Because liability is conceded. So all we're looking at is what is the evidence as to the value, the objective value of a hypothetical license. And what concerns me the most about your position is where is the evidence of what the fair market value would be to an arm's-length purchaser of such a license, as distinct from what the use was, what use was made and what the profits were, which is a different measure of damages. I agree completely, Your Honor. And the legal error in the case is that the district court prevented Oracle altogether from using the hypothetical license valuation to express fair market value of the infringed copyrighted material. And I agree with you, Your Honor. Oracle was entitled not to rely on lost profits or lost license fees. It was entitled under this Court's well-established law to rely on fair market value. But what's the evidence of fair market value? Your Honor, if there were ever a textbook case of evidence of fair market value, which after all under this Court's precedence means what would a willing licensee have to pay a willing licensor ex ante the infringement at the time of the infringement in order for the copyright holder to forego an injunction and the would-be user to have a right to use? Now, that standard, willing buyer, willing purchaser, willing licensor, willing licensee ex ante the infringement, that's well settled. The only question here is whether that applies where, as is the case here, Oracle chose to maintain its exclusive ownership of the copyrighted materials and not to license. And so, Your Honor, the evidence lies in contemporaneous documentary evidence, pre-litigation evidence, taken out of both companies' financial projections back in 2004, 2005. Now, you've got two companies. SAP is twice the size of Oracle at the time. Oracle's about to acquire PeopleSoft. That's the first big threat to SAP's market domination. So there's a lot of detailed financial data that Oracle compiles in connection with the PeopleSoft acquisition, and that SAP, now SAP has what it's called the PeopleSoft attack strategy. And they have financial data. But all of that demonstrates what they could have earned from it, which is different from what is the price of a license. In other words, if you want to pay X for a license, presumably if you acquire the goods or services for that amount X, you're going to try to make X times 3. And so the evidence is very strong about how much they wanted to earn, but that doesn't necessarily suggest anything about what the license would have cost. So, Your Honor, let me first directly answer your question, where is the evidence? And let me give you some examples from the record about why this was objective, not subjective evidence. It was pre-litigation. Well, even if it's objective, my concern is it's evidence of something else. That's my concern. So, Your Honor, let me be clear what the basis for the calculations were. We're fighting over, two companies are fighting over a fixed set of customers. There's an expected stream of revenue from each customer. And each company is predicting what if I get these customers and I multiply at times my per customer stream of revenue, what will I earn at my profit margin? And the other company is thinking, SAP is thinking, well, if we can convert customers, we'll earn, well, we'll earn X, and X was lower because they were going to undercut Oracle. That was their strategy. Lost leader. Use discounted maintenance contracts and then try to convert. I think the easiest way to show why, so a license, Your Honor, here would have been the price of the revenue stream. We're not talking about a patent case where we're talking about a license to a small component of a cell phone. We're talking here about license revenue that would have had to match the expected revenue stream. But we're talking past each other a little bit because I see the evidence of the expected revenue stream. What I didn't see was an expert or someone else saying, given that revenue stream, here's what an arm's length license would have cost someone to acquire the right to try to get that revenue stream. And those are very, very different questions. One is, how much money can I make? And the other is, what do I have to pay for the components to allow me to continue in my business to try to make that amount? And so that's where I think that I thought the evidence was talking past what I think the issue is. And I'm not sure that I'm making my question clear. I understand exactly, Your Honor. But may I do it in two steps? First, let's be clear what the evidence is of the expected income stream. And I just want to illustrate it with one simple example, SAP's own numbers about PeopleSoft. If you look at what Oracle's expert relies on is he says, well, what did SAP expect to earn from converting Oracle's customers? And then he looks at what did Oracle expect to make from those customers if they weren't converted? It's a very simple formula in both sides. And the willing licensee, willing licensor analyzes the bilateral negotiations, so it looks to both sides. You ask how many customers, how much money per customer is the expected stream over a period of years, and what is our profit margin? And that gives you your revenue stream. And let me just use one illustration. If you look at ER1173, it's reprinted twice. ER1173 is the same as ER799. This is from a PowerPoint that was part of SAP's strategy for the Tomorrow Now acquisition. And on that page, you'll see that SAP's own management says that the PeopleSoft attack strategy using Tomorrow Now is going to yield $897 million in new customer revenues over three years. How is that going to happen? If you look on that page, you'll see they expect to have 3,000 maintenance contracts, and of those, they expect to be able to convert, now that we're undercutting Oracle on maintenance contracts and accusing them of gouging, will convert $1,375. Counsel, all of this is fascinating, but so far none of it has answered my question, and I'm not sure whether that's because there isn't any evidence of the kind that I'm asking about. So not at all, Your Honor. This evidence is hypothetical license evidence of the most objective kind. Now, perhaps, Your Honor, it's hypothetical revenue information, which is not the same as hypothetical license, because the license is an expense that a company pays in order to achieve the revenue stream. It isn't the same as the revenue stream. They may be vastly different in value. Presumably, they are, because if you paid out 100 percent of what you expect to earn, you won't make any profit. But, Your Honor, please, perhaps I can answer it this way. As Professor Goldstein points out in his analysis of the case in Goldstein at 14.1 of the treatise, which explains hypothetical licenses, he says you have to the software maintenance revenue is just a part of Oracle's overall business. Oracle's overall relationships with its customers depend on this software, this copyrighted software, which enables customer support, maintenance of customer support. But that's not the whole revenue of the business, Your Honor. So perhaps to answer your question, these revenue streams show what you would have to pay in a lump sum license to get access to the maintenance software. That is, has a fair market value, we believe, amply supported at 1.3 billion, as part of the overall business. In other words, this isn't about the total revenue of the company. It's about revenue for one aspect of the company. Well, it isn't about revenue. That's the problem. It's about the cost of the license, which is an element that you would pay in order to achieve this revenue. And that's why I think we're talking past each other, and that's my sense of what the evidence is talking past also. Your Honor, can – I'd like to just do this step by step. I'd like to convince you that the evidence here was objective, not subjective. And there's a legal error in the district court's holding. The district court grants Jamal for two reasons. One, she says, if you're not willing to license, you can never get hypothetical license damages. That, we submit, is error. That copyright. It's not this circuit's law. Your Honor? No, that's right. I'm agreeing with that. That doesn't necessarily win the case for you, but I agree with you on that point. Thank you, Your Honor. If you – if you agree on that part, we go to the next step. The district court says, well, alternatively, I am going to grant Jamal because the evidence of the license value here is insufficient because it's too subjective. Your Honor, I'd at least like to defeat that by showing you that the revenue stream evidence was objective. In fact, it's hard to think of more objective evidence than SAP's own valuation at the time of the estimation. Well, to some extent, there's subjective assessments of what they're likely to earn. Correct, Your Honor. And these are objective. And if I could just refer you, if you do look at ER1173. I think – I think Judge Pius said the opposite of what you're saying, that it's a subjective assessment. But, Your Honor, it's – let me suggest that if I were in front of you and I were saying, well, Oracle's executives came into court and they said, well, I wouldn't have licensed unless you gave me $4 billion. Maybe that could have been a subjective assessment. But that is not this case. This is a case in which that did happen, but the jury didn't look to that. The jury picked $1.3 billion, which is right in between the amount that Oracle's experts said Oracle would have wanted for this software, $1.4 billion, $1.386 billion, and 897, the amount that SAP valued. If you take the same customers and you're trying to decide who's going to get them and, of course, Oracle doesn't know at the time until Buffy Ransom discovers it in November of 2006 that PeopleSoft is being undercut by someone who stole Oracle's software. If the number that would – an actual – the number that a license would have to be to take this software in a license negotiation would be somewhere between the position of the licensor, the owner of the copyrighted material, and the licensee. The jury came in right in that sweet spot. And, Your Honor, I think your problem is, am I – is Oracle saying that it's entitled as a license to the entire revenue? But you have to generalize – look at the right level of generality. This is a license for software that is a small component of Oracle's overall business. You need a license to this software, which we believe a lump sum license of $1.3 billion would fairly value this copyrighted material, but that's only a small percentage of Oracle's overall business. Yeah, no, I got that. Here's my – here's my problem with the case from your side, and we've got problems with the other side, too. But here's my problem from your side. I don't know how trustworthy these numbers are. For example, the numbers that we've got here on 1173, as far as I can tell, SAP never announces these numbers in a way where they're legally required to have truthful projections. This is all internal stuff. So they're not saying to the customers or out to the stock market in general, okay, here are the numbers we anticipate. This may be sort of pie in the sky, dreaming, and so on. The theory of your case is that using TomorrowNow, they hoped – and TomorrowNow's basic misuse of the software that it certainly was not entitled to have allows them not only the income stream of the maintenance, but also to convert the customers. That's right, Your Honor. It's a little unclear to me – I mean, there are a lot of steps in there in terms of how many of the customers will be converted. So at the time that they're engaging in this practice – and I agree with your expert that says we don't look at it after the fact, we look at it in terms of the time they would have been engaging in the forbidden practice. That's the hypothetical license. It seems to me that there are a lot of variables in there that make it at least somewhat speculative as to how much they would have thought this was worth it to them to pay. One thing that occurs to me is maybe we should look at how much did SAP pay to acquire TomorrowNow, which is, of course, the instrument by which they seek to do all this. Did they pay a lot to acquire TomorrowNow? Your Honor, they paid a lot less than Oracle did to acquire PeopleSoft. Do you know what they did pay? I can't quote it right now. I'll try to come back to it. It's about $10 million. Sorry, Your Honor? It's about $10 million. Right, Your Honor. So let me just address the question about whether SAP thought these were pie in the sky. And if I could just refer you to the cover email for the It appears on ER 1163. And this is where SAP management at the highest level say that they had given extensive input and guidance on those numbers. That's on page 1163. And, Your Honor, if I could just refer you to one more page. At ER 678, you'll see an email from an SAP top manager that says — I'm sorry, this is testimony from an SAP top manager that says, yes, we believe those estimates were reasonable, the estimates of the conversion of customers. And then you also have testimony at trial from SAP's witnesses that we actually thought those numbers were conservative. That's at page ER 674. I thought we could do better. Now, Your Honor, where I'm going with this is that the $897 million projection — $897 million is SAP's projection of how much revenue it can get from the infringed copyright — the infringement of copyright over a mere three-year period. So if you multiply that out to the 10-year relationship, that it's undisputed in the record that 10-year relationships were a normal metric for people to think about customer relationships. On that, I would refer you to ER 816, which is an S&P, an outside consultant, evaluation of how 10-year relationships — these are sticky relationships because it's very SAP's own calculations are based on 10-year customer maintenance relationships. I say all that, Your Honor, just to say that $897 million is not pie in the sky. SAP is an established business, not a new business. It's just making a new acquisition, and it's trying to go after an existing customer base. This is very far from a kind of fanciful field of dreams kinds of projection. And we think that where Oracle has shown that SAP's own contemporaneous figures were so high in their projection, even if they think they got the company very soon — Let me ask you a question that will take you in a slightly different direction, and that is, as I look at our case law on hypothetical licensing, I see cases in which there's an established practice by the licensor of letting licenses. This is not that case, obviously. There's a market that looks as though what this kind of license would go for, even though this particular person wouldn't license it. We've got that. The cases in which we do hypothetical licensing as a measure of damages seem to me to have more standard evidence in terms of the fair market value of such license. Do you have a case that looks anything like what we've got here? We do not, Your Honor. And I hope I can reserve some time for rebuttal, but may I answer? You have about two minutes. Oh, we do not, Your Honor, but we respectfully suggest you should extend your case law to this case. If anything, this case should be stronger than those cases, because as Stewart v. Abin makes clear, Oracle has a right not to license. Copyright holder has a right to maintain exclusivity. Under Georgia Pacific and the patent world, that makes the fair market value of the patent go up. And therefore, it would be perverse to deprive the copyright holder that wants to keep exclusive control of its license of the opportunity to show fair market value through an objective evidence, which we submit this is. I'll reserve the rest of my time. Thank you, Your Honor. You may do that. May it please the Court? Good morning. My name is Greg Lanier, and I'm defending the appellees today. This Court has never permitted or affirmed the award of a hypothetical license measure of actual damages without evidence that there was a license fee or a license opportunity to be lost. To Judge Fletcher's question, the cases not only seem that way, that is what they consistently hold, not only in this circuit, but in every circuit, the Second Circuit. Let me make sure I understand what you just said. Are you saying that a hypothetical license is not available as a damage award when the would-be licensor simply says, I never licensed? Are you saying that the law of case law says that? If there is sufficient credible evidence that the would-be licensor would not have entered the licensing market, then that might be enough. That's not this case, because the overwhelming evidence was that there was no license fee that was lost. There was no similar license to indicate that there was a licensing market. No, no, no. I'm just trying to get your – you purported to describe to me what the existing case law is. Could you restate that so I understand what your position is as to the existing case law? Yes, Your Honor. The existing case law provides clearly in the Ninth Circuit and other circuits that the hypothetical license is not available as a measure of actual damages for copyright infringement without sufficient evidence of a lost licensing fee or a lost licensing opportunity. To the specific question of whether the licensor's testimony alone is enough to dispose of a case, our position would be, yes, in that case, which is not this one, if there is sufficient credible testimony that the licensor would never have entered the licensing  So you're saying that our case law says that if the – the oracle entity says, I would never have licensed this, end of story, you can't get hypothetical license? If that's sufficient credible testimony, that's correct. Again, it's not the facts here. I don't read the case law as saying that. Well, Your Honor, I think the case law addresses the testimony of the licensor or potential licensor in two contexts. One is the question addressed by the Court's first ruling on our motion for judgment as a matter of law, whether the license remedy is available. In that context, we think that testimony would be relevant. And, again, in the facts of this case, that doesn't need to be dispositive. It's not dispositive. This Court's case law and the case law of other circuits is very clear that you disregard that testimony if you get to the second question, the question of valuation of any hypothetical license remedy, if it is available. That's where I'd like to direct your attention, because I guess what my question to you is, is if we disagree with your reading of the case law and if we were to conclude that damages of this variety can be obtained in the absence of willingness to license, then do you necessarily lose or do we just go on to the valuation question? Oh, we definitely do not lose, Your Honor. We do go to the valuation question. That's exactly the methodology advocated by this Court in the Frank case and applied in the Polder-Bear case and many other cases, and most recently persuasively by the Fourth Circuit in the Dash case that we submitted under Rule 28J. Again, to emphasize and then turn to the question of valuation, our position is not that the facts of this case require a holding that an unwilling licensor is enough to end the availability of that license theory, because there was no evidence of past licensing practices by Oracle. There was no evidence of any other software company ever engaging in a license like this. And, of course, there was the testimony about not only Oracle's statements of intent from its executives, but the explanation of the business rationale to acquire the IP, making it clear that granting such a license would make no business sense. But then turning to the valuation question, even if the Court disagrees with the trial court on that question, we then need to turn to the question of whether the license award that was granted by the jury was unduly speculative, based on unduly speculative evidence, such as as a matter of law, the trial court was correct in tossing out the jury's verdict. And the answer is unequivocally yes. And Your Honor's question is really focused on the key issue here, and it's a key distinction. The issue is not just is there objective evidence per se, but is there objective evidence of what a willing buyer and a willing seller would pay? That's the key question here. Putting aside the question of whether this projection document, as it's been discussed, Plaintiff's Exhibit 12 at ER 799, is objective evidence. It's not objective evidence. It's not evidence at all of what a willing buyer and a willing seller would pay. Now, wait a minute. Why do you say it's not evidence at all? I mean, here we've got numbers being presented to the Board. I'm assuming that there's some obligation within the company to not have completely fanciful numbers presented to the Board. I understand this is not a public state, but subject to the various securities laws that might be applicable. But this is some evidence. You may wish to say it's not worth as much as they think it is and so on, but there's got to be some evidence of what they think it's worth. It's some evidence of what some people within SAP thought was sufficiently credible to present to the Board. And you say some people. I mean, they're presenting it to the Board. This is not some guy three layers down. That's right, Your Honor. But then let's look at what this evidence is. This is evidence of someone making what they thought, the witness was Thomas Zeman, whose testimony was just referred to, what he thought were reasonable and reliable projections of what might happen. But there's some differences between that and the hypothetical licensing situation at issue here. This is evidence of it. This is evidence of hopes, expectations, even projections of what might happen if SAP were to implement the overall plan. And the overall plan was not just the acquisition of TomorrowNow, which, as of this point, SAP had not even yet met. This is evidence of what people were thinking of might happen if SAP was able to use a variety of different methods to win many customers from Oracle. Let me make sure I understood that. This is now just timing of when SAP acquired TomorrowNow. Are you saying that these projections, and this is, I'm just educating myself at this point, these projections were made without even having entered into negotiations with TomorrowNow? That's correct, Your Honor. Did they not know of the existence of TomorrowNow at this point? They did know of the existence of TomorrowNow. TomorrowNow is mentioned in the document on one of the earlier pages when they're describing the overall approach, which is offer license discounts, offer our own particular type of software called NetWeaver, and try to lock customers down by offering maintenance services. They mention TomorrowNow as a player, but there has been no acquisition of TomorrowNow at that point. There are other players in the market. What's in the record, if anything, as to the negotiations between SAP and TomorrowNow? I know that what starts seeing to me actually a fairly low acquisition price, 8 million euros translated into dollars. Do we know anything surrounding that purchase? It took place entirely, those discussions took place entirely in late December and January, late December 2004 and January of 2005. Right. That's the entire period of the negotiations. Do we have any internal evidence from, for example, SAP as to what they expected to get in terms of revenue given what SAP, what, excuse me, what TomorrowNow seemed to be offering and so on? The plaintiff's exhibit either 6 or 7, and I'll try to remember the ER site for that, Your Honor, is the document that was presented to the board specifically with respect to the acquisition of TomorrowNow. And that document laid out the business case. It's called a business case. It was a document that Oracle featured prominently at trial. It acknowledged the potential for copyright risk and a variety of other things. It was very heavily discussed at trial. That was the document that SAP's board looked at to determine whether to acquire TomorrowNow specifically. The document that we've been discussing today is a document that SAP's board was presented in connection with the question of whether to enter into and expand on this so-called safe passage program, which was much, much bigger than acquiring TomorrowNow. And that's the key point. So to Your Honor's question, this is evidence of something. Of course it is. But it's not evidence of what a willing buyer and a willing seller would have paid or agreed was the price for a license to do what TomorrowNow. Is that the only basis, factual basis, that Meyer relied upon in formulating his opinion? No, it's not, Your Honor. He relied on a variety of other things. He relied on, for example, testimony about the acquisition price of the companies. He relied on that very heavily. Oracle's witnesses relied on that very heavily. And as we argued and as courts have found, including, for example, the Realview case on which Oracle actually relies, evidence of such things, evidence of development costs of software, evidence of R&D costs, evidence of acquisition costs, is too speculative. It's too attenuated to serve as reliable, non-speculative evidence of what a willing buyer and willing seller would have agreed. Is there any document that parallels the projections of revenue found at 799 that describes the expenses or inputs that would be required in order to achieve that stream of revenue? There's not, Your Honor. The document that you see is typical of the internal documents at the time. What the jury was presented with to help determine what might a willing buyer and willing seller agreed to was evidence of the acquisition price of the companies involved, evidence of development costs, evidence of goals, assumptions, projections of the type here. That was the primary evidence. And then, of course, the demands of Oracle's executives, principally Mr. Ellison. In fact, it was argued earlier that this is not a case where somebody walks in and said, I need $4 billion. That's, in fact, exactly what happened in this case. That was exactly Mr. Ellison's testimony that should properly be disregarded in this analysis. That is the most obviously subjective evidence going to the question of valuation. To sum up what the jury was asked to do, there's no better place to look than to how this question was argued to the jury by trial counsel for Oracle. And at ER, at supplemental excerpts of record 162 and 63 is where trial counsel's argument comes down to this question of valuation. And here's what was argued. You have two numbers, ladies and gentlemen. You have one number, which is $1 million times 3,000 customers. And you have this number Mr. Meyer came up with. And the answer is probably somewhere in there. So exactly what the jury was asked to do is exactly what counsel just argued is the thing they shouldn't be asked to do, to guess, to split babies, to do anything like that. That is the proof that the evidence on which Oracle relies is exactly the sort of unduly speculative evidence. It's unduly speculative piece by piece, and it's unduly speculative when the jury is asked without guidance of any kind to take that evidence about acquisition prices and then turn it into an assessment of what a willing buyer and a willing seller would have paid for the license at issue in this case. You know, I'm looking back at this chart on ER 1173, the projected revenues for three years presented to the board. That does not assume that tomorrow now is the mechanism by which this is going to be achieved. What is or what are the mechanisms by which this is going to be achieved if we're looking at the assumptions underlying the chart on 1173? That, if you look at the preceding pages of the documents, Your Honor, you'll see discussion of what it is. The principal one is a discount program. For all of the hyperbole, the safe passage program was fundamentally a discount program. And as set forth in this document and substantial other parts of the record, the basic business pitch, as it were, was customers, you're uncertain about Oracle buying these other customers or buying these other companies. You've had your software forever with PeopleSoft. You might be worried, is Oracle going to make you change? Come to SAP, and by the way, we'll give you a discount. And we'll give you a discount on what? Because as it turns out, once they get tomorrow now, tomorrow now is giving them a discount on maintenance of Oracle software. But without tomorrow now, they can't give them a discount on maintenance of Oracle software. They're going to have to give them a discount on something else. So what are they discounting? The price of the software itself, the license price of the software. Switch from your existing software. But you see, that's an entirely different mechanism that they're then assuming than the mechanism that they employ. Because to apply the mechanism that you're now telling me about, a discount on SAP, they've got to get them to make the transition basically right now because they don't have the capacity, absent tomorrow now, to do a maintenance program with respect to Oracle software. What am I missing? What you're missing, Your Honor, is that every customer is individually situated. So some customers could make the transition right away. They were at transition points. Some customers might elect to stay with Oracle software maintenance while they were transitioning to another customer. Some customers might elect to go self-support, that is, take care of themselves during that transition period. So there were a variety of different scenarios. That's why this case properly comes down to lost profits for maintenance and infringers' profits for getting customers over to SAP. That's why, for example, the court, in looking at the remittiture question, distinguished between the testimony that went to software licensing and maintenance profits. The remittiture amount, this is where I have some difficulty. The remittiture amount seems low to me. The alternative amount, given the evidence, what is your position on that? We think the remittiture amount was appropriate, Your Honor, and just to walk through the steps because there were two different analyses to get to that lowered amount. The total number that was offered by Oracle's expert, albeit on cross examination, was $408.7 million for the sum of lost profits and non-duplicative infringers' profits. The trial court, in ordering the remittiture, looked separately at each question. On the case of lost profits, which was, or excuse me, infringers' profits, which was the bulk of the award, the original claim was $288 million. The trial court noted the testimony of Mr. Meyer about how he had questions about three of those customers actually having gone over to SAP because of Tomorrow Now and other evidence that the court mentions in her ruling. And disregarded those three customers. That took the infringers' profits number down to $236 million. The other question was the award of lost profits. That is, profits Oracle would have gained from providing maintenance services to customers going down the road that it lost because those customers switched to Tomorrow Now. In that case, most of the, all of the remittiture amount was reduced down because of the Oracle expert's testimony about whether customers would stay with Tomorrow Now or be gone from Oracle after Tomorrow Now shut down. What happened was that Tomorrow Now ceased operations in 2008. The expert provided two numbers, actually, at trial. He provided a calculation for lost profits damages through 2015. And he, on his own, separately provided a calculation of damages through 2008, the date when Tomorrow Now shut down. The only evidence that the expert offered to support the longer lost profits damages period was that customers tend to stay with Oracle a long time. But if I understand what the district court did, she took the number as of the time Tomorrow Now shut down without any extrapolation of stickiness, but based on the stickiness. Is that right? That's exactly right. And that was proper. But that seems to me wrong, meaning there's going to be some. The only question is how much. Well, Your Honor, there's two types of stickiness to talk about. One, the only testimony on which there was evidence of stickiness is customers, once they become your software customer, they stick with you. That relates to the question of infringer's profits. Once SAP got a customer, how long would they keep that customer? And there was no reduction or remitted or made on the infringer's profits side to reflect that stickiness issue. There was no reduction because of any assumptions or analysis about stickiness. On the lost profits question, once Tomorrow Now shuts down, then those customers have not actually switched to SAP because they're still getting support for their Oracle software or PeopleSoft software. So then the question is what do they do? And by the time of trial, there was evidence. Some of them went back to Oracle. Some of them went on self-support. Some of them went to other people. And there was no evidence offered by the expert to help the jury figure out. No, there was his opinion, wasn't there? Yes, there was his opinion, Your Honor. That's evidence. That is evidence. And the jury could believe it, accept it. The jury could believe it and accept it if there was any analysis. To some extent. Apparently they found him credible, correct? We don't know that the jury found the expert credible. Well, he might have their award of $1.3 billion and it looks like they gave him some credit. It looks like they accepted the trial counsel's offer to pick a number somewhere in there is what it looks like they did, inflamed by a lot of evidence about theft, inflamed by specific references to one of the employers of a member of the jury. That's what it looks like they did. And what actually happened there on this question of stickiness was, to use the more precise word to Your Honor's question, there was no analysis by the expert. He said, I've given a number from 2000 to 2008 and a number to 2015. He actually didn't explain why it sticks to 2016 except the stickiness of software customers. And the district court, exercising its discretion as under the DNS Ready Mix case, determined that that extra period of lost profits was not sustainable by the evidence. Can I ask you one last question? Your time is almost up. But as I understand it, if the case goes back and is retried, let's just assume for a moment that it's retried, as I understand it, any damages based on a hypothetical license is off the table. Is that right? That's correct, Your Honor. On the current rules. Is that your position? Is that how you argue? Is that, I mean? Yes, absolutely, Your Honor. We don't think the hypothetical license remedy should be available as a matter of law, and we understand the Court may or may not agree with us on that. But also the evidence that's available was under the spectrum. Well, if we disagree again, then why isn't it still available? I don't know. I didn't quite understand the discretion. Because there's no evidence that the district court can provide that establishes its entitlement to the remedy. Even the offer of proof that it submitted on the very day the stipulated judgment was filed to get that evidence on the record. It's a new trial, though, isn't it? I mean, it's a new trial on the question of damages. It's a new trial on the question of damages, but the district court ruled that the loss or the hypothetical license remedy should not be included because the evidence was wholly speculative. As a matter of law. As a matter of law. Assessing the evidence, her conclusion was that it was wholly speculative. We think there should be a new trial limited to lawsuit and infringer's profits either based on the grant of judgment as a matter of law or based on the new trial. Okay. Thank you, Your Honors. Thank you, counsel. Ms. Sullivan, you have some time remaining. Thank you, Your Honor. I'd like to bring us back to the procedural posture of the case. There was a jury verdict here. And when I hear my friend relitigate this on the facts, I just want to remind us we have to take all inferences in favor of the verdict. And also, let's remember the fundamental principle that the damages provisions of the Copyright Act are to be construed broadly to favor victims of infringement and here that's Oracle. So with those two principles in mind, I'd like to respectfully suggest that my opponent's argument would lead you to remit those copyright holders like Oracle, who exercise their rights to exclusivity by declining to license, it would remit them to only infringer's profits or lost profits and foreclose them from hypolicense damages. That's not consistent with this Court's prejudice. What is your answer to Judge Paez's question? If we were to disagree with the district court on the theoretical availability of the hypothetical, theoretical availability of hypothetical license damages and thus that they could be available, but disagree that there was sufficient evidence to support the award in this case, what would be the result upon retrial? Then, Your Honor, you should remand with instructions to permit hypothetical license damages of the object of kind we submitted before. If it's meant that's unnecessary, because I'd like to convince you that the evidence we already submitted to the object. I understand that, but that's the whole point of hypothetical questions is they assume things that you don't concede, and I understand that you strenuously don't concede, but I'm trying to also understand your position on just the procedure that's available. Your Honor, we believe that you should reverse the JAMAL because of legal error, that in fact the type of license damages were deemed unavailable to Oracle because it doesn't have a licensing history or didn't lose licensing opportunities. Once you've done that, we believe you should reinstate the jury's verdict because it was supported by object of evidence. If you don't reinstate the verdict, then you should remand with instructions to permit a trial that includes hypothetical license damages, notwithstanding the absence of licensing history. Your Honor. Okay. I realize we're taking over time, so whatever we need to do to answer the question, just don't worry about the time. It's a two-part question. It appears to me that the district judge, in setting up the new trial, looked at what happened in the trial that took place and said that Oracle, you know, they spent a lot of money on their expert. They had a lot of time. They put in a lot of evidence. They probably put in the best evidence they had. But I was unconvinced, as a matter of law, that the evidence supporting the hypothetical license award of damage was simply too speculative. And I'm now kind of reading between the lines, I guess, with what the district judge thought, and I see no prospect of that evidence significantly improving. Therefore, the new trial is going to be, you know, there's no point in putting that in. Let's go back to the sort of the damages, the lost profit measure. Now, is that what's going on with the district judge? And if that's what's going on, why is she wrong if she's right as to the question of hypothetical license in the first place? I understand you're not going to concede that she's right, but if she is. Your Honor, in two parts. First, if she's wrong about hypothetical license damages being available as a category, then you should reinstate or send it back with instructions to permit hypothetical license damages. But if she's second, if she's resting on the alternative ground, that even if hypothetical license damages are okay as a category here, this evidence was insufficiently objective, then we submit that, too, was legal error. First of all, the standard, taking all inferences in favor of the verdict, is a reasonable range, and we think the jury here was well within a reasonable range. No, no, I got that. But you're not telling me that Oracle is going to come in with a lot of new evidence. Well, Your Honor, if we – there's also a notice issue. We were never told that you had to come in and say we would have licensed in order to have the benefit of the fair market value. No, no, no. I mean, a lot of new evidence in terms of what the anticipated revenue stream was by SAP and, therefore, the price they would have paid had a license been available to them. I assume you pretty much put in whatever evidence you got. Well, Your Honor, we believe we have a right to retry it with additional evidence that we would – that we should have the opportunity to pursue. But we think that this evidence was objective and sufficient. Okay, I got that. Now, the second part of my question is, assuming the new trial goes forward, which may or may not happen, but assuming the new trial goes forward, the limitation of what she's doing looks like an interlocutory order to me. Is that appealable at this time? Your Honor, we think that the set of evidentiary constraints on the new trial were all improper as a matter of law and are connected to the legal error about hypothetical license damages. In other words, we – if you don't want to reach those questions prior to a new trial, we would ask at a minimum that you instruct that the new trial include hypothetical license damages. That's what we think is the most important thing, and that's clearly presented by the orders that are before you. If you regard the other questions as too preliminary, then they can be reached on remand. But, Your Honor, just to add to that question, if I could just – may I just finish one last point where I was trying to address a prior question? Yes, a quick one. Yes, Your Honor. Your Honor, as to these objective evidence being just revenues, it is not. I would ask you to look at Meyer's testimony, where he shows that the revenue projections were just inputs to his fair market value analysis. And that's in the testimony at ER 429-32, 451-52, and 460-62, to address Your Honor's concern that these were raw revenue numbers. They were not. They were inputs to an accepted form of fair market valuation analysis. We think it was objective and sufficient, and we should not have an affront to the jury system by taking down a verdict that was within a reasonable range. Thank you, Your Honor. The case just argued is submitted. We appreciate both counsel's arguments in this interesting case. And we will be in recess for about 10 minutes.
judges: Graber, Fletcher, Paez